**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| KORRIE SMYRE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C. A. No. : 13-387-SLR-MPT |
| | : | |
| JASON AMARAL, JOYCE JOHNSON, | : | |
| LEROY WILLIAMS, AND | : | |
| MHM SERVICES, INC., | : | |
| | : | |
| | : | |
| Defendants. | : | |

**REPORT AND RECOMMENDATION**

## I.    INTRODUCTION

Before the court is a motion, filed by defendant MHM Services, Inc. ("MHM"), to

partially dismiss plaintiff's amended complaint[1] for failing to state a claim upon which

relief can be granted pursuant to FED. R. CIV. P. 12 (b)(6).  Specifically, MHM moves for

dismissal of Count VII which alleges *respondeat superior* liability against MHM for all

claims raised against defendant Jason Amaral ("Amaral"), and Count XIII[2] for civil rights

violations as asserted in Count XII against defendant Joyce Johnson ("Johnson").[3]

Plaintiff seeks leave to amend the amended complaint to plead a civil rights claim

against MHM.[4]

For the reasons that follow, the court grants MHM's motion to partially dismiss

---

[1] D.I. 3.
[2] Incorrectly numbered in the amended complaint as Count XII.
[3] D.I. 3 at 2.
[4] D.I. 11 at 13.

Count XIII of the amended complaint.  Therefore, Count XIII, to the extent that it asserts a claim for *respondeat superior* against MHM for civil rights violations committed by Johnson, is dismissed.  MHM's motion to dismiss Count VII of the amended complaint, to the extent that it asserts *respondeat superior* liability against MHM for civil rights violations by Amaral, is also granted.  Plaintiff's request to amend his amended complaint to assert a civil rights claim against MHM is granted.

## II.    BACKGROUND

### a.    Procedural History

This action arises from claims by prison inmate Korrie Smyre ("plaintiff"), that he was sexually abused by a drug treatment counselor during his incarceration at the Sussex Correctional Institute in Georgetown, Delaware ("SCI").[5]  Plaintiff filed his original complaint on January 24, 2013 in the Superior Court for the State of Delaware,[6] which he subsequently amended on February 4, 2013, to assert claims against MHM, as well as three individually named employees of MHM working as treatment counselors at SCI.[7]

As this matter involves claims in which this court has original jurisdiction, MHM removed the matter pursuant to 28 U.S.C. 1441.[8]  Removal in this case was proper because plaintiff's amended complaint asserts claims pursuant to 42 U.S.C. § 1983 against defendants Amaral, Johnson, and through the doctrine of *respondeat superior* against MHM.

---

[5] D.I. 1, Ex. B at ¶ 6.
[6] *Id.*, Ex. A.
[7] *Id.*, Ex. B.
[8] D.I. 1.

2

### b.      Relevant Facts

### 1.      Abuse by Amaral

Because this matter involves a Rule 12(b)(6) motion to dismiss, the properly pled facts come from the amended complaint.[9]  For the purposes MHM's motion, all reasonably pled facts asserted are assumed true.  At all relevant times, plaintiff was incarcerated with the Delaware Department of Corrections ("DOC").[10]  MHM had contracted with DOC to provide mental health, substance abuse, and sex offender treatment to Delaware inmates.[11]  One such service involved the KEY Program, which provides substance abuse treatment.[12]  Amaral, Johnson and Leroy Williams ("Williams") were employed by MHM as treatment counselors in that program.[13]

In late 2010, plaintiff applied to the KEY Program, and when accepted, was transferred to SCI.[14]  Around January 25, 2011, plaintiff entered Phase I of that program.[15]  Amaral was a counselor and/or administrator for Phase III of the Program.[16]

Plaintiff learned in January 2011 that his foster mother had been diagnosed with cancer, and sought counseling with Johnson to address his concerns regarding the diagnosis.[17]  During their discussion, Amaral entered the office that he shared with Johnson and observed plaintiff crying.[18]  He informally offered to provide counseling

---

[9] D.I. 1, Ex. B.
[10] *Id.* at ¶ 6.
[11] *Id.* at ¶ 7.
[12] *Id.* at ¶ 9.
[13] *Id.* at ¶¶ 10-15.
[14] *Id.* at ¶ 18.
[15] *Id.*
[16] *Id.*
[17] *Id.* at ¶ 19.
[18] *Id.* at ¶ 20.

services.[19]  Amaral subsequently learned personal information about  plaintiff which he

allegedly used to "gain [his] trust."[20]  Plaintiff continued to use Amaral as a counsel

unaware of Amaral's alleged sinister intentions.[21]

Although Williams was plaintiff's primary counselor, Amaral took significant

interest in plaintiff.[22]  In late January or early February 2011, Amaral began introducing

sexually provocative conversation during their sessions, and invited plaintiff to engage in

sexual activity with him.[23]  In February 2011, Amaral instructed plaintiff to write a letter

containing sexually provocative language to Amaral,[24] and threatened administrative

segregation to ensure plaintiff's compliance.[25]  Thereafter, Amaral's sexually

provocative and suggestive comments intensified, which ultimately resulted in demands

by him for plaintiff to engage in sexual activity.[26]  The majority of the sexual conduct

occurred in the office used by Johnson, Williams and Amaral when plaintiff and Amaral

were alone.[27]  According to plaintiff, Amaral "seemed to know where to stand in the

office to avoid being seen by passers by," which "led [plaintiff] to believe he was not

Amaral's first victim."[28]  Plaintiff's foster mother died from cancer on March 15, 2011.[29]

In April 2011, Amaral physically forced himself on plaintiff, and on three separate

occasions touched plaintiff's penis.[30]  Amaral would also "rub on" plaintiff's body, and

---

[19] *Id.* at ¶ 21.
[20] *Id.* at ¶ 23.
[21] *Id.* at ¶ 24.
[22] *Id.* at ¶ 28.
[23] *Id.* at ¶ 25.
[24] *Id.* at ¶ 25-26.
[25] *Id.* at ¶ 26.
[26] *Id.* at ¶ 30.
[27] *Id.* at ¶¶ 29-33.
[28] *Id.* at ¶ 33.
[29] *Id.* at ¶ 31.
[30] *Id.* at ¶ 32.

asked plaintiff to place his penis in Amaral's mouth; plaintiff refused.[31]  During this time

Amaral committed numerous inappropriate acts, including showing plaintiff his thong

underwear, claiming he and plaintiff were "friends with benefits," and forcing plaintiff to

touch his penis on three occasions, and to kiss him on the neck and mouth.  Amaral

also provide his phone number so plaintiff could be his "secret sex lover" once plaintiff

was released from prison.[32]  In May or June 2011, plaintiff, along with 60 other inmates,

was moved from the building in which Amaral's office was located to a different

building.[33]

Around this time, Amaral, Williams and mental health counselor "Mr. Mike" met

with MHM supervisor Deneen Smith ("Smith"), who had observed Amaral spending

considerable time with plaintiff.[34]  While the amended complaint is unclear about this

meeting,[35] Smith purportedly instructed that plaintiff was to remain in his new location,

H1, and was not to return to his previous housing in H2, near Amaral's office.[36]  Amaral,

however, allegedly had another inmate removed from the KEY Program and had

plaintiff rehoused to an area near Amaral's office.[37]  Angered by Amaral's disregard of

her directive, Smith confronted and informed him that he needed to "keep his relation

with [plaintiff] professional."[38]  Smith was released from her employment or fired by

MHM in June 2011.[39]

---

[31] *Id.*
[32] *Id.* at ¶ 34.
[33] *Id.* at ¶ 32.
[34] *Id.* at ¶ 36.
[35] *Id.*
[36] *Id.*
[37] *Id.* at ¶ 37.
[38] *Id.*
[39] *Id.* at ¶ 38.

On one occasion, Amaral punished plaintiff after he commented about Amaral's actions.[40]  On July 5, 2011, Amaral gave plaintiff a "KEY-Crest Learning Experience Form" for disrespecting program staff, which restricted plaintiff from television, telephone, visits, recreation or gym privileges.[41]  These restrictions were the alleged "hammer Amaral used to force [plaintiff] to engage in the sexual harassment and abuse."[42]

Around July 12, 2011, plaintiff reported the abuse to Johnson.[43]  Johnson purportedly responded that she believed Amaral was sexually abusing an inmate, but was unaware it was plaintiff.[44]  Johnson took no action in response to plaintiff's allegations.[45]  Thereafter, Amaral stopped physically touching and sexually molesting plaintiff, but continued counseling him.[46]

Plaintiff further alleges that "employees of MHM were aware that the office used by Amaral had a 'blind spot,'"[47]and that "some employees used that office to engage in sexual relations with inmates in prior years;"[48]  He further contends "another MHM employee resigned or was fired in May 2011 for engaging in sexual relations with a patient-inmate."[49]  He also claims employees of MHM and/or employees of DOC suspected Amaral initiated inappropriate sexual relations with another inmate at SCI,[50]

---

[40] *Id.* at ¶ 39.
[41] *Id.*
[42] *Id.*
[43] *Id.* at ¶ 40.
[44] *Id.*
[45] *Id.*
[46] *Id.* at ¶ 41.
[47] *Id.* at ¶ 93.
[48] *Id.*
[49] *Id.*
[50] *Id.* at ¶ 94.

and contacted or attempted to contact this inmate after his release.[51]

In mid-August 2011, plaintiff reported the abuse to Williams.[52]  Around August 19, 2011, plaintiff met with Sergeants Hubbs, Breedlove and Santini of the DOC regarding his encounters with Amaral,[53] and later with Staff Lieutenant Hickman.[54]  Allegedly some or all of those individuals met with the warden and/or deputy warden of SCI.[55]  Plaintiff remained out of the Key Program on that day until Amaral's shift ended later that afternoon.  Thereafter, Plaintiff had no further contact with Amaral.[56]

Mike Tigue, Esq. of DOC's Internal Affairs met with plaintiff on August 30, 2011, and advised he "would talk to Johnson and Williams."[57]  Plaintiff was also instructed by another individual from Internal Affairs not to discuss "this incident with Amaral" with anyone else, which he interpreted as not filing a grievance.[58]  Plaintiff did, however, talk to mental health treatment providers about his experience.[59]

### 2.    Plaintiff's Mental Health

Plaintiff was diagnosed with paranoid schizophrenia in 2008.  While at SCI, he was prescribed Seroquel, Depakote and Risperdal.[60]  Plaintiff understood his mental health diagnosis and treatment were included in his medical records.[61]  While under counseling, Amaral required plaintiff execute a release to allow him access to plaintiff's

---

[51] *Id.*
[52] *Id.* at ¶ 42.
[53] *Id.* at ¶ 43.
[54] *Id.*
[55] *Id.*
[56] *Id.* at ¶ 44.
[57] *Id.* at ¶ 45.
[58] *Id.* at ¶ 46.
[59] *Id.*
[60] *Id.*
[61] *Id.* at ¶ 22.

medical and/or mental health records.[62]

### 3.     Plaintiff's Alleged Injuries

As a result of Amaral's misconduct, plaintiff alleges he suffers from the following: post-traumatic stress disorder ("PTSD"), including flashbacks of the abuse; hypertension, which requires medication; a fear of people; aggravation of his pre-existing paranoid schizophrenia; depression; a desire not to be touched and to seclude himself; problems with trust, including mental health professionals; emotional humiliation; sleeplessness; and loss of enjoyment in hobbies, such as sports, which require medical and/or psychiatric treatment.[63]

### 4.     Plaintiff's Claims

In his amended complaint, plaintiff alleges fifteen counts against defendants. Plaintiff asserts the following causes of action against Amaral:  Count I - Assault and Battery;[64] Count II - Civil Rights Violation;[65] Count III - Intentional Infliction of Emotional Distress;[66] Count IV - Medical Malpractice;[67] Count V - Negligent Infliction of Emotional Distress;[68] and Count VI - Invasion of Privacy.[69]  Plaintiff alleges, in Count VII, that MHM, by virtue of *respondeat superior*, is liable for all claims against Amaral.[70]

He asserts the following causes of action against MHM:  Count VIII - Negligent

---

[62] *Id.*
[63] *Id.* at ¶ 48.
[64] *Id.* at ¶¶ 49-53.
[65] *Id.* at ¶¶ 54-58.
[66] *Id.* at ¶¶ 59-64.
[67] *Id.* at ¶¶ 65-75.
[68] *Id.* at ¶¶ 76-80.
[69] *Id.* at ¶¶ 81-84.
[70] *Id.* at ¶¶ 85-90.

Supervision/Retention[71] and Count IX - Negligence.[72]

As against Johnson, plaintiff claims:  Count X - Negligence;[73] Count XI - Intentional Infliction of Emotional Distress[74] and Count XII - Civil Rights Violation.[75]  In Count XIII[76], he alleges that MHM, as the employer, is liable for Johnson's conduct.[77]

In Count XIV,[78] plaintiff asserts negligence against Williams.[79]  Finally, he alleges, in Count XV,[80] *respondeat superior* liability against MHM for William's conduct.[81]

## III.    STANDARD OF REVIEW

In analyzing a motion to dismiss under FED. R. CIV. P. 12(b)(6), a review of Rule 8(a)(2) is necessary.  It requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  That standard "does not require 'detailed factual allegations,' but . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[82]  Thus, to survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[83]  The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case.[84]  Evaluating a motion to dismiss under Rule 12(b)(6) requires

---

[71] *Id.* at ¶¶ 91-103.
[72] *Id.* at ¶¶ 104-14.
[73] *Id.* at ¶¶ 115-29.
[74] *Id.* at ¶¶ 130-34.
[75] *Id.* at ¶¶ 135-40.
[76] Mislabeled as Count XII in plaintiff's amended complaint.
[77] D.I. 1, Ex. B at ¶¶ 141-46.
[78] Mislabeled as Count XIII in plaintiff's amended complaint.
[79] D.I. 1, Ex. B at ¶¶ 147-61.
[80] Mislabeled as Count XIV in plaintiff's amended complaint.
[81] D.I. 1, Ex. B at ¶¶ 162-67.
[82] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).
[83] *Id.* (citing *Twombly*, 550 U.S. at 570); *see* FED. R. CIV. P. 12(b)(6).
[84] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

the court to accept as true all material allegations of the complaint.[85]  "The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims."[86]  A motion to dismiss may be granted only if, after, "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to the plaintiff, plaintiff is not entitled to relief."[87]

To survive a motion to dismiss under Rule 12(b)(6), however, the factual allegations must be sufficient to "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."[88] A plaintiff is obliged "to provide the 'grounds' of his 'entitle[ment] to relief'" beyond "labels and conclusions."[89]  Heightened fact pleading is not required; rather "enough facts to state a claim to relief that is plausible on its face" must be alleged.[90]  The plausibility standard does not rise to a "probability requirement," but  requires "more than a sheer possibility that a defendant has acted unlawfully."[91]  Rejected are unsupported allegations, "bald assertions," or "legal conclusions."[92]

Further, "the tenet that a court must accept as true all of the allegations

---

[85] *Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004).

[86] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks and citation omitted).

[87] *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks and citations omitted).

[88] *Twombly*, 550 U.S. at 555; *see also Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007).

[89] *Twombly*, 550 U.S. at 555.

[90] *Id.* at 570.

[91] *Iqbal*, 556 U.S. at 678.

[92] *Id.* ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (citations omitted); *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light* Co., 113 F.3d 405, 417 (3d Cir. 1997) ("unsupported conclusions and unwarranted inferences" are insufficient); *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996) (allegations that are "self-evidently false" are not accepted).

contained in a complaint is inapplicable to legal conclusions."[93]  Moreover, "only a

complaint that states a plausible claim for relief survives a motion to dismiss," which is a

"context-specific task that requires the reviewing court to draw on its judicial experience

and common sense."[94]  Thus, well-pled facts which only infer the "mere possibility of

misconduct," do not show that "'the pleader is entitled to relief,'" under Rule 8(a)(2).[95]

"When there are well-pleaded factual allegations, a court should assume their veracity

and then determine whether they plausibly give rise to an entitlement of relief."[96]

## IV.   DISCUSSION

### a.   MHM's *Respondeat Superior* liability of MHM's under 42 U.S.C. § 1983 for Conduct by Johnson

MHM argues it cannot be liable for civil rights claims pursuant to 42 U.S.C. §

1983 under *respondeat superior* and, therefore, such claims in Count XIII for the

conduct of Johnson must be dismissed.[97]  Plaintiff agrees.[98]  Consequently, Count XIII,

to the extent that it asserts a claim for *respondeat superior* against MHM for violations

under § 1983 committed by Johnson, is dismissed.

### b.   MHM's *Respondeat Superior* Liability under 42 U.S.C. § 1983 for Actions by Amaral and Plaintiff's Request to Amend

Plaintiff's amended complaint alleges MHM is liable, by virtue of *respondeat*

*superior*, for violations by Amaral of his constitutional rights pursuant to 42 U.S.C. §

---

[93] *Iqbal*, 556 U.S.at 663; *see also Twombly*, 550 U.S. at 555 (a court is "not bound to accept as true a legal conclusion couched as a factual allegation").
[94] *Id.* at 678.
[95] *Id.*
[96] *Id.*
[97] D.I. 3 at 5.
[98] D.I. 11 at 3.

1983 and the Eighth Amendment.[99]  MHM contends because plaintiff has cited to no policy or custom on its part, the allegations against Amaral in Count II cannot be imputed to MHM, and must be dismissed.[100]  Plaintiff agrees *respondeat superior* cannot be the basis for MHM's liability for its employee's conduct.[101]  Since MHM cannot be liable through *respondeat superior* for claims under § 1983, any civil rights contentions against MHM based on the conduct of Amaral in Court VII must also be dismissed.

Plaintiff argues, however, he has sufficiently and adequately pled a direct civil rights claim against MHM, not based on *respondeat superior*, and should be permitted to amend to more adequately express his contentions.[102]  Because the evidence does not show that an amendment would be inequitable, prejudicial or futile, plaintiff's request to amend will be granted.

The Supreme Court has consistently held that "vicarious liability is inapplicable to § 1983 suits."[103]  "A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*."[104]  "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."[105]  In *Iqbal,* the Supreme Court emphasized that "in a § 1983 suit–here masters do not answer for the torts of their

---

[99] D.I. 1, Ex. B at ¶¶ 54-58, 85-90.
[100] D.I. 3 at 5.
[101] D.I. 11 at 4.
[102] *Id.* at 4-6.
[103] *Iqbal*, 556 U.S. at 676.
[104] *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citing *Parratt v. Taylor*, 451 U.S. 527, 537 n.3 (1981); *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 (3d Cir. 1976)).
[105] *Rode*, 845 F.2d at 1207.

servants–the term 'supervisory liability' is a misnomer.  Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."[106]  The factors necessary to establish a § 1983 violation will vary with the constitutional provision at issue.[107]

The Third Circuit has reiterated a § 1983 claim cannot be premised upon a theory of *respondeat superior*, and in order to establish liability for deprivation of a constitutional right, a party must show personal involvement by each defendant.[108] Under this circuit's precedent pre-*Iqbal*, "there are two theories of supervisory liability." Supervisors may be liable if they "established and maintained a policy, practice or custom which directly caused [the] constitutional harm."  They also may be liable if they "participated in violating plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in [their] subordinates' violations."[109]  The Third Circuit recognizes the potential effect that *Iqbal* might have on altering the standard for supervisory liability under § 1983, but presently has declined to decide whether *Iqbal* narrows the scope of the analysis.[110]

*Natale v. Camden County Correctional Facility* determined for an employer to be liable under § 1983, the plaintiffs must "provide evidence that there was a relevant policy or custom, and that the policy caused the constitutional violation they allege."[111]

---

[106] *Iqbal*, 56 U.S. at 677 (2009).
[107] *See id.*
[108] *See Brito v. United States Dep't of Justice*, 392 F. App'x 11, 14 (3d Cir. Aug. 18, 2010) (not published); *see also Rode*, 845 F .2d at 1207.
[109] *See Santiago v. Warminster Twp.*, 629 F.3d 121, 127 n.5 (3d Cir. 2010) (internal quotation marks omitted).
[110] *See Santiago*, 629 F.3d at 130; *Bayer v. Monroe County Children and Youth Servs.*, 577 F.3d 186, 190 n. 5 (3d Cir. 2009) (stating in light of *Iqbal*, it is uncertain whether proof of personal knowledge, with nothing more, provides sufficient basis to impose liability upon supervisory official).
[111] 318 F.3d 575, 584 (3d Cir. 2003).

13

The court further cautioned that "not all state action rises to the level of a custom or policy."[112]  A policy arises "when a decisionmaker possess[ing] final authority to establish . . . policy with respect to the action issues a final proclamation, policy or edict."[113]  Custom can be proven by showing that "a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law."[114]

A custom may also exist where "the policymaker has failed to act affirmatively at all, [although] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'"[115]  "Allegations of an isolated incident . . . are not sufficient to show the existence of custom or policy under 42 U.S.C. § 1983."[116]  Consequently, in order for MHM to be liable under § 1983, the evidence must support a finding that it, with deliberate indifference to the consequences, it established and maintained a policy, practice or custom which directly caused plaintiff constitutional harm.[117]

Here, plaintiff acknowledges *respondeat superior* cannot be the sole basis for MHM's liability for Amaral's alleged violation of his constitutional rights.[118]  His present

---

[112] *Natale*, 318 F.3d at 584.

[113] *Id.* (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir.1996))

[114] *Miller v. Corr. Med. Sys., Inc.*, 802 F. Supp. 1126, 1132 (D. Del. 1992) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)); *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).

[115] *Natale*, 318 F.3d at 584 (internal citations omitted).

[116] *Jones by & Through Jones v. Berwick Area Sch. Dist.*, C.A. 94-1818, 1995 U.S. Dist. LEXIS 21164, at *8 (M.D. Pa. Mar. 10, 1995) (internal citations omitted).

[117] *Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 725 (3d Cir. 1989).

[118] D.I. 11 at 4.

amended complaint does not allege a custom or policy by MHM, sufficient to directly allege a claim against it.[119]   As an initial matter, no proposed amended pleading was attached to his response as required under LR 15.1(a).  Plaintiff contends he asserted adequate facts to support his request to file a second amended complaint expressly pleading a civil rights claim against MHM, and points to paragraphs 93-95 of the amended complaint as setting forth the relevant facts on this issue, which were not incorporated in Count VII.[120]

Under FED. R. CIV. P. 15(a), "leave [to amend] shall be freely given when justice so requires."  Under Third Circuit law, "if a plaintiff requests leave to amend a complaint vulnerable to dismissal before a responsive pleading is filed, such leave must be granted in the absence of undue delay, bad faith, dilatory motive, unfair prejudice, or futility of amendment."[121]   The amendment must be permitted unless it would be inequitable or futile, "as when the proposed new allegations fail to state a claim upon which relief can be granted."[122]   "[T]he grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason [*i.e.*, inequity or futility] appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules."[123]

Here, plaintiff has asserted barely sufficient facts to support his request to file a

---

[119] D.I. 3 at 5.
[120] D.I. 1, Ex. B at ¶¶ 85-95.
[121] *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) (citing *Foman v. Davis*, 371 U.S. 178, 182; *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir.1997)).  *See also Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).
[122] *Walton v. Mental Health Assn. of Se. Pa.*, 168 F.3d 661, 665 (3d Cir. 1999).
[123] *Grayson*, 293 F.3d at 108 (citing *Foman*, 371 U.S. at 182).

second amended complaint, limited to expressly pleading a claim under § 1983 of a practice or custom against MHM.

Plaintiff acknowledges there was no MHM policy in place that caused the constitutional violation,[124] but contends a custom of MHM caused the violation,[125] as evidenced by its failure to rectify the "blind spot" in the office in which plaintiff was abused.[126]  According to plaintiff, "Amaral seemed to know where to stand in the office to avoid being seen by passers by," which led him to suspect there had been other victims.[127]  Plaintiff also notes employees of MHM were aware that the office in which the abuse occurred had a blind spot,[128] and "some employees used that office to engage in sexual relations with inmates in prior years."[129]  Finally, plaintiff alleges Johnson suspected Amaral was molesting an inmate, but was unaware it was plaintiff.[130]

Because these allegations may plausibly rise to the level of stating a claim that a custom of MHM resulted in a violation of plaintiff's constitution rights, granting leave to amend at this time, appears to be neither prejudicial nor futile.  Therefore, plaintiff's request to amend to add a direct civil rights violation against MHM is granted.  MHM's motion to dismiss Count XIII based on *respondeat superior* for civil rights violations committed by Amaral, is granted.

### c.    MHM's Liability, by Virtue of *Respondeat Superior*, for Remaining

---

[124] D.I. 11 at 4 (citing D.I. 1, Ex. B at ¶ 57).
[125] D.I. 11 at 4.
[126] D.I. 1, Ex. B at ¶ 93.
[127] *Id.* at ¶ 33.
[128] *Id.*
[129] *Id.*
[130] *Id.*

**Claims Against Amaral**

Finally, Count VII of plaintiff's amended complaint alleges MHM is liable for the
remaining claims against Amaral via *respondeat superior*.[131]  MHM argues that because
Amaral's actions were not within the course and scope of his employment as a
counselor with MHM, it is not liable for such actions, requiring the count to be
dismissed.[132]  The court agrees, and grants MHM's motion to dismiss Count VII, which
relies on liability for MHM through the conduct of Amaral.

In Delaware, responsibility for an employee's tortious conduct, committed in the
scope of employment, will be imputed to the employer under the doctrine of *respondeat
superior*.[133]  It is well settled, however, that an employer is only liable for "the torts of his
employee committed while acting in the scope of his employment."[134]  The term "scope
of employment" is somewhat amorphous, and Delaware courts have often looked to the
Restatement of Agency for guidance in defining and applying that term.[135]  Section 228
of the Restatement provides:

> (1) Conduct of a servant is within the scope of employment if, but only if:
> (a) it is of the kind he is employed to perform; (b) it occurs substantially
> within the authorized time and space limits; (c) it is actuated, at least in
> part, by a purpose to serve the master, and (d) if force is intentionally used
> by the servant against another, the use of force is not unexpectable by the
> master.  (2) Conduct of a servant is not within the scope of employment if
> it is different in kind from that authorized, far beyond the authorized time or

---

[131] D.I. 1, Ex. B at ¶¶ 85-90.  Those claims are for assault and battery, intentional affliction of emotional distress, medical malpractice, negligent infliction of emotional distress and invasion of privacy. *Id.* at ¶¶ 49-53 and 59-84.

[132] D.I. 3 at 7.

[133] *Doe v. Giddings*, C.A. No. N10C–08–178 PLA, 2012 WL 1664234, at *2 (Del. Super. May 7, 2012).

[134] *Fields v. Synthetic Ropes, Inc.*, 59 Del. 135, 143 (Del. 1965).

[135] *Tell v. Roman Catholic Bishops of Diocese of Allentown*, C.A. Nos. 09C-05-171 JAP, 09C-06-196 JAP, 2010 WL 1691199, at *10 (Del. Super. Apr. 26, 2010); *see also Wilson v. Joma, Inc.*, 537 A.2d 187, 189 (Del. 1988).

space limits, or too little actuated by a purpose to serve the master.[136]

It makes no difference whether the employee's tortious conduct is negligent or intentional.[137]

> Under § 229,
>
> [t]o be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized."[138]  "In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered: (a) whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (c) the previous relations between the master and the servant; (d) the extent to which the business of the master is apportioned between different servants; (e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant; (f) whether or not the master has reason to expect that such an act will be done; (g) the similarity in quality of the act done to the act authorized; (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant; (i) the extent of departure from the normal method of accomplishing an authorized result; and (j) whether or not the act is seriously criminal.[139]

The determination of whether an employee was acting within the scope of employment is "ordinarily one for decision by the jury, unless the contrary is so clearly indicated by the facts that the court should decide it as a matter of law."[140]  Under § 245, an employer is liable for the intentional tortious conduct of his employee "if the act was not unexpectable in view of the duties of the [employee]."[141]

---

[136] *Tell*, 2010 WL 1691199, at *10 (quoting Restatement (Second) of Agency § 228).
[137] Restatement (Second) of Agency § 228 (1958); *see also Simms v. Christina Sch. Dist.*, C.A. 02C-07-043 JTV, 2004 WL 344015, at *5  (Del. Super. Jan. 30, 2004) (quoting *Draper v. Olivere Paving & Const. Co.*, 54 Del. 433, 441 (1962)).
[138] *Id.* § 229 (1958).
[139] *Id.; see also Draper*, 54 Del. at 442.
[140] *Draper*, 54 Del. at 442 (citing Restatement (Second) of Agency, § 228, comment d).
[141] Restatement (Second) of Agency § 245 (1958).

18

Delaware has also adopted the dual purpose doctrine, which states that "conduct of an employee, although done in part to serve the purposes of the servant or a third person, may be within the scope of employment if the employer's business actuates the employee to any appreciable extent."[142]  First cited in Delaware in *Wilson v. Joma, Inc.*, the Delaware Supreme Court noted that "[w]here the servant is combining his own business with that of his master, or attending to both at substantially the same time, no nice inquiry will be made as to which business the servant was actually engaged in when a third person was injured; but the master will be responsible, unless it clearly appears that the servant could not have been directly or indirectly serving his master."[143] Thus, under the dual purpose doctrine, the fact that "the primary motive of the servant is to benefit himself or a third person does not cause the act to be outside the scope of employment."[144]

*Draper v. Olievere Paving & Construction Co.* outlines when an employee's actions fall within the scope of employment enabling *respondeat superior* to operate against the employer.[145]  The Delaware Supreme Court reiterated that "liability for the torts of the servant is imposed upon the master only when those torts are committed by the servant within the scope of his employment which, theoretically at least, means that they were committed in furtherance of the master's business."[146]  The court further commented that in the case of intentional torts, the "Restatement would impose liability

---

[142] *Wilson v. Joma, Inc.*, 537 A.2d 187, 189 (Del. 1988) (citing *Best Steel Bldgs., Inc. v. Hardin*, 553 S.W.2d 122, 128 (Tex. Civ. App. 1977)).
[143] *Id.* (citing *Ryan v. Farrell*, 208 Cal. 200, 280 P. 945 (1929)).
[144] *Wilson*, 537 A.2d at 189.
[145] *Draper*, 54 Del. at 433.
[146] *Id.* at 441.

upon the master for his servant's intended tortious harm 'if the act was not unexpectable in view of the duties of the servant.'"[147]  The court acknowledged, however, that "the problem of determining whether or not a particular tortious act was one performed within the scope of the servant's employment for which the master consequently is liable is one which, of necessity, can be answered only in the light of the particular circumstances of the case under consideration."[148]

In *Draper*, the employer was retained to reconstruct a street.[149]  Its employee was operating a road grader on the shoulder of the road when he became involved in an argument with a motorist, who he believed had ignored signs and barricades.[150]  The argument escalated to an assault in which the employee cut the motorist severely in the neck with a corkscrew.[151]  The court held summary judgment in favor of the employer was not proper because a jury could find that the employee was acting within the scope of his employment when he attacked the motorist.[152]

The court found "it will be obvious that at least part of the tests to determine if particular conduct is within the scope of employment laid down in Restatement of Agency (2nd), § 228, has been met without question."[153]  The employee was directing traffic when the assault occurred.[154]  The attack also occurred during the employee's work hours and on the site where he was employed, and his initial actions leading up to

---

[147] *Id.* at 433.
[148] *Id.* at 442.
[149] *Id.* at 436.
[150] *Id.* 437.
[151] *Id.*
[152] *Id.* at 444.
[153] *Id.*
[154] *Id.*

the assault were in performance of the employer's business.[155]  Thus, the court found

"the only element about which there can be any real debate is whether or not

[employee's] use of intentional force was expectable by [employer]."[156]  In response to

this inquiry, the court stated "we think men might differ.  Certainly, there is nothing in

this record to throw any light whatsoever on the question of whether or not the use of

force by traffic directors on construction jobs is so rare as to be unexpectable."[157]

The court pointed to numerous decisions from other jurisdictions involving

physical assaults committed by employees while they were on the job,[158] and concluded

"it is a close and difficult question of fact as to whether the assault . . . was entirely the

product of [the employee's] anger, which arose independently of his performance of the

duties of his employment, or whether it occurred while [employee] was in fact in the

performance of his duties, and was motivated at least in part by the desire to serve his

master's interests."[159]  Because "the facts taken most favorably to the plaintiffs show a

continuous course of action which commenced initially at least with the carrying out by

[employee] of the duties for which he had been hired,"[160] it found an issue of fact.

More recent case law has addressed whether sexual abuse by an employee

may be considered within the scope of employment.  The relevant Delaware cases on

this issue, detailed below, have found that such conduct is never motivated by a desire

to serve the employer, and cannot properly be within the scope of employment.

---

[155] *Id.*
[156] *Id.*
[157] *Id.* at 445-46.
[158] *Id.* at 446-48.
[159] *Id.* at 445.
[160] *Id.* at 448.

In *Simms v. Christina School District*, the Superior Court found a school residential advisor was not acting within the course and scope of his employment when he sexually assaulted a student at the school.[161]   The plaintiff, who attended the school, was hearing and mentally impaired, and the facility was the designated public educational institution for children with hearing impairments.[162]   The employee was a residential advisor, employed to supervise older male students, who resided in the dormitory.  The employee's job duties included "[p]rovid[ing] a safe and orderly home-like environment for students," "[d]evelop[ing] and monitor [ing] behavior management systems," and "[d]evelop[ing] and implement[ing] programs to promote student growth (linguistic, social, emotional and intellectual)."[163]

While living in the school dormitory, the plaintiff was repeatedly sexually assaulted by the residential advisor.[164]   In his complaint, the plaintiff alleged the school district and officials were vicariously liable for the sexual abuse committed by the employee.[165]   The court found that while the employee was "clearly taking advantage of his position as a residential advisor during work hours and at the workplace, no employment related activity was even remotely taking place when [the employee] was sexually abusing the plaintiff."[166]

The court in *Simms* distinguished the facts from those in *Draper*,[167] because the

---

[161] *Simms*, 2004 WL 344015, at *8.
[162] *Id.* at *1.
[163] *Id.*
[164] *Id.* at *2-3.
[165] *Id.* at *4.
[166] *Id.* at *5.
[167] *Draper*, 54 Del. at 443.

assault in *Draper* "occurred in the context of employment related activity."[168]  *Simms*,

however, involved continuous sexual abuse which did not occur in the context of

otherwise authorized acts.[169]  Granting the defendant's motion for summary judgment,

the court determined "a jury could not find that [employee's] continuous sexual abuse of

the plaintiff was actuated, at all, by a purpose to serve his employer, or that his

misconduct was, in any way, expectable by his employer."[170]

    In *Tell v. Roman Catholic Bishops of Diocese of Allentown*, the issue was

whether a Delaware court could assert personal jurisdiction over two out-of-state

Catholic dioceses and a Catholic parish in Maryland.[171]  Both matters arose from

alleged sexual abuse occurring in Delaware by priests employed by one of the out-of-

state entities.[172]  The plaintiff argued the employer should be held vicariously liable for

the priests' conduct.[173]  The court held "if the moving defendants are liable under the

doctrine of *respondeat superior,* the conduct of the abusing priest is attributable to his

employer and will determine the jurisdictional issue."[174]

    In determining whether the priest's conduct was within the scope of employment,

the court stated "as one court aptly put it, sexual abuse by a priest "'represent[s] the

paradigmatic pursuit of some purpose unrelated to his master's business.'"[175] It further

noted "the cases which have considered the issue have uniformly rejected the

---

[168] *Simms*, 2004 WL 344015, at *7.
[169] *Id.*
[170] *Id.*
[171] 2010 WL 1691199, at *1.
[172] *Id.* at *1-3.
[173] *Id.* at *9.
[174] *Id.*
[175] *Id.* at *11 (quoting *Tichenor v. Archdiocese of New Orleans*, 32 F.3d 953, 960 (5th Cir.1994)).

contention that a priest is acting within the scope of his employment when he sexually abuses a minor because the priest was not hired to engage in such conduct and because the abuse is not motivated by a purpose to serve the church."[176]  Concluding the sexual abuse as outside of the scope of employment, the court found "it is difficult, if not impossible, to envision how the assaults furthered the church's purpose . . . Neither plaintiff offers any suggestion how their abuser's conduct furthers the church's business. Indeed, both concede that their abuser's conduct was for his own purpose and not that of the church."[177]  Consequently, the plaintiffs' jurisdictional claims could not be base on the conduct of the priests.[178]

In a similar matter, *Doe v. Giddings*, the plaintiff accused an on-duty state police officer of rape while being detained on shoplifting charges.[179]  She claimed *respondeat superior* against the state for the officer's actions.[180]  In granting summary judgment, the court found the officer's "conduct falls outside the scope of his employment as a matter of law."[181]  It further noted despite being a police officer, who maintained custody over the plaintiff at the time of the alleged incident, nothing in the record supported the defendant's conduct was consistent with the scope of his employment.  "Common sense dictates that sexually assaulting a crime suspect, a clear abuse of police authority under any circumstances, is not incidental to the arrest and detention of a suspect,"[182] finding the crime alleged "is so outrageous, and such a clear abuse of [the officer's]

---

[176] *Id.* at *10.
[177] *Id.* at *11.
[178] *Id.* at *12.
[179] *Doe*, 2012 WL 1664234, at *1.
[180] *Id.* at *1.
[181] *Id.* at *3.
[182] *Id.*

position and authority . . . that it would be *unreasonable as a matter of law* for a jury to find that [the officer] acted in the scope of his employment."[183]

Here, nothing alleged "raise[s] a reasonable expectation that discovery will reveal evidence"[184] that Amaral's sexual abuse was within the scope of his employment. Because acting within the scope of employment is a necessary element for *respondeat superior* to apply, plaintiff has failed to state a claim under Rule 12(b)(6). This conclusion is supported by an application of the factors found in the Restatement of Agency, as well as the relevant case law.

Applying Restatement of Agency § 228, Amaral's conduct was not within the scope of employment, because it was not of the kind he was employed to perform as a counselor in the Key program. According to plaintiff, Amaral's services were required to be consistent with standards,[185] which expressly prohibit "sexual intimacy with clients [as] unethical," and "certified counselors will not be sexually, physically, or romantically intimate with clients."[186] The standards also provide "certified counselors do not condone or engage in sexual harassment, which is defined as unwelcome comments, gestures, or physical contact of a sexual nature."[187] Although the alleged abuse occurred in Amaral's office on the prison grounds during working hours as required under § 228(1)(b), the continuous course of abuse would not serve a purpose of MHM. As admitted by plaintiff, Amaral took extensive measures to secrete his conduct from his employer, as he forced plaintiff to "lie to his first counselor at SCI, Mr. Mike Miller, to

---

[183] *Id.* at *4 (emphasis added).
[184] *Twombly*, 550 U.S. at 555.
[185] D.I. 1, Ex. B at ¶ 11.
[186] *Id.* at ¶ 11.
[187] *Id.* at ¶ 70.

cover up his abuse."[188]  Finally, although force and intimidation were used by Amaral, no

facts are alleged that such conduct was expectable by MHM.  As previously discussed,

it was contrary to the expectations of MHM.  While physical force may be required or

foreseeable by a prison guard, MHM had no reason to anticipate that a counselor would

engage in sexual activity against an inmate.

Under § 229, sexual abuse is not an acceptable act commonly occurring with

counselors, is outside the enterprise of MHM, nor are any facts alleged that MHM would

expect such conduct to occur.  Sexual abuse is not similar in quality to the counseling

authorized, and is an extreme departure from appropriate psychological treatment.[189]

Finally, Amaral's actions likely constitute criminal activity since sexual relations

between inmates and employees of contractors at a detention facility is a crime.[190]

Pursuant to 11 DEL. C. § 1259, "a person is guilty of sexual relations in a detention

facility when, being . . . a contractor or employee of a contractor at a detention facility

 . . . the person engages in consensual sexual intercourse or sexual penetration with a

person in custody on the premises of a detention facility."[191]  If consensual sexual

relations are prohibited, then such nonconsensual activities would constitute serious

criminal conduct under § 229(2)(j), which takes Amaral's behavior outside scope of

employment.

Under § 245,[192] Amaral's misconduct was directly counter to his role as a

---

[188] D.I. 1, Ex. B at ¶ 27.
[189] Restatement (Second) of Agency, § 229 (1958); *see also Draper*, 54 Del. at 442.
[190] 11 DEL. C. § 1259.
[191] *Id.*
[192] Restatement (Second) of Agency § 245 (1958) (an employer is liable for the intentional tortious conduct of his employee "if the act was not unexpectable in view of the duties of the [employee]").

counselor and is an extreme departure from the expected proper behavior for that

position.  As alleged by plaintiff, rather than acting in furtherance of MHM's purpose of

providing mental health, substance abuse and sex offender treatment,[193] Amaral sought

to fulfill "his own needs and desires in his 'counseling' of [plaintiff] at [plaintiff's]

expense,"[194] making his actions fall outside the scope of employment.

Plaintiff further argues the dual purpose doctrine operates against MHM because

"the abuse occurred in the midst of authorized, employment-related activities . . . that

being the provision of counseling to a patient-inmate."[195]  The factual allegations do not

suggest MHM's business actuated Amaral "to any appreciable extent."[196]  In *Simms*, the

court found that "no employment related activity was even remotely" occurring when the

sexual abuse happened.[197]  Similar to the facts in *Simms*, in which the residential

advisor was hired to provide assistance to residential students living in the dorm rooms,

Amaral was employed as a counselor.  However, although the abuse occurred within

the prison, Amaral was not plaintiff's primary counselor, since he was employed as a

counselor/administrator for Phase III of the KEY Program at SCI, while plaintiff was

participating in Phase I.[198]

Assuming Amaral was assigned to provide mental health treatment to plaintiff, no

employment-related activity was taking place when the sexual abuse occurred.   Amaral

clearly "could not have been directly or indirectly serving"[199] MHM.  Thus, the dual

---

[193] D.I. 1, Ex. B at ¶ 7.
[194] *Id.* at ¶ 74.
[195] D.I. 11 at 9.
[196] *Wilson v. Joma, Inc.*, 537 A.2d 187, 189 (Del. 1988).
[197] *Simms*, 2004 WL 344015, at *5.
[198] D.I. 1, Ex. B at ¶ 18.
[199] *Wilson*, 537 A.2d at 189 (citing *Ryan v. Farrell*, 208 Cal. 200, 280 P. 945 (1929)).

purpose doctrine is inapplicable, and Amaral's actions were outside the scope of employment.

Delaware case law establishes that sexual assault and sexual abuse committed by an employee, regardless of the context, falls outside of the course and scope of employment, and does not further the work or interests of the employer.[200]  The circumstances in the instant matter are analogous to those in *Simms*, *Doe*, and *Tell*, which demonstrate that Amaral's continuous sexual abuse of plaintiff did not promote the purposes of MHM.

Although *Simms* and *Doe* involved motions for summary judgment, *Tell*, however, concerned a motion to dismiss for lack of personal jurisdiction,[201] which recognized all factual allegations in the complaint as true and viewed all factual inferences in the favor of the plaintiff-nonmoving party.[202]  These three cases address the application of *respondeat superior* in sexual abuse matters under Delaware law, and demonstrate that plaintiff, in the instant matter, has not alleged a claim for relief against MHM.

*Simms*, *Doe*, *and Tell* establish that sexual abuse is not within the scope of employment.  In *Tell*, the court referenced voluminous case law in numerous jurisdictions who have "overwhelmingly, if not uniformly . . . held that a priest who

---

[200] *See supra* notes 166-88 and accompanying text.
[201] *Tell*, 2010 WL 1691199, at *8.
[202] *Id.* at *3 (citing *Daily Underwriters of America v. Maryland Auto. Ins. Fund*, C.A. No. 07C-08-208 RRC, 2008 WL 3485807, at *2 (Del. Super. July 31, 2008); *Wright v. American Home Products Corp.*, 768 A.2d 518, 526 (Del. Super. 2000)).

sexually abuses another is not acting within the scope of its employment."[203]  Similar to

---

[203] *Tell*, 2010 WL 1691199, at *11 (citing *Mark K. v. Roman Catholic Bishop*, 67 Cal. App. 4th 603, 609 (Cal. Ct. App.1998) (allegations of sexual abuse of a minor were outside the scope of the clergy member's employment); *Moses v. Diocese of Colorado*, 863 P.2d 310, 329 (Colo.1993) (alleged sexual misconduct of priest not within course and scope of employment); *Destefano v. Grabrian,* 763 P.2d 275, 287 (Colo.1988) ("When a priest has sexual intercourse with a parishioner it is not part of the priest's duties"); *Dewaard v. United Methodist Church*, 793 So.2d 1038, 1041 (Fla. App. 2001) (church not held liable for pastor's sexual misconduct because "the sexual conduct alleged by plaintiffs was for the personal motives of the pastor, and not designed to further the interests of the church"); *Alpharetta First United Methodist Church v. Stewart*, 472 S.E.2d 532, 535-36 (Ga. Ct .App.1996) (granting judgment in favor of church on claim for alleged sexual misconduct by minister, holding "it is well settled under Georgia law that an employer is not responsible for the sexual misconduct of an employee" and "[t]his is especially true of the sexual misconduct of a minister"); *Konkle v. Henson,* 672 N.E.2d 450, 457 (Ind. Ct. App.1996) ("The unauthorized acts committed by [the priest] are not similar to his duties as a minister. [The priest] may have had access to [the plaintiff] because of his position as pastor, but he was not engaging in authorized acts or serving the interests of his employer at the time he molested [the plaintiff]. Thus, we conclude that summary judgment in favor of the Church Defendants on the issue of respondeat superior liability was proper."); *Gagne v. O'Donoghue*, No. CA 941158, 1996 WL 1185145, at *5 (Mass. Super. June 26, 1996) (holding, in sexual abuse context, "there is little likelihood that the instant plaintiff will prevail upon a 'scope of employment' theory of vicarious liability because the torts he alleges fall well outside the scope of the perpetrators' employment"); *H.R.B. v. J.L.G.*, 913 S.W.2d 92, 97 (Mo. Ct. App.1995) (affirming dismissal of claims against archdiocese because the priest's sexually abusive acts "clearly were not part of defendant's duties as a priest or as a teacher, nor were they intended to further any religious or educational interests of the Catholic Church"); *Joshua S. v. Casey*, 615 N.Y.S.2d 200, 201 (N.Y.1994) (priest's alleged sexual assault of child is neither within the scope of employment nor in furtherance of the employer's business); *Byrd v. Faber,* 565 N.E.2d 584, 588 (Ohio 1991) ("The Seventh-day Adventist organization in no way promotes or advocates nonconsensual sexual conduct between pastors and parishioners [, and t]he appellants did not hire [the priest] to rape, seduce, or otherwise physically assault members of his congregation."); *N.H. v. Presbyterian Church*, 998 P.2d 592, 599 (Okla.1999) ("Ministers should not molest children. When they do, it is not a part of the minister's duty nor customary within the business of the congregation . . . No reasonable person would conclude that [the priest's] sexual misconduct was within the scope of employment or in furtherance of the national organizations' business."); *R.A. ex rel. N.A. v. First Church of Christ*, 748 A.2d 692, 700 (Pa. Super. 2000) (affirming dismissal of claim against church based on alleged sexual misconduct by minister by holding "[n]othing about [the priest's] sexual abuse of R.A. had any connection to the kind and nature of his employment as a minister"); *Howard v. Guidant Mut. Ins. Group*, 785 A.2d 561, 563 (R.I. 2001) ("Clearly, a sexual liaison with a parishioner falls outside of the scope of a minister's employment; *Dausch v. Rykse,* 52 F.3d 1425, 1428 (7th Cir.1994) (affirming dismissal of claim against church based on alleged sexual misconduct by pastor because "the church defendants could not be held vicariously liable for actions done by [the priest] solely for his own benefit and not as a part of his ministerial duties"); *Tichenor*, 32 F.3d 953 at 959-60 ("It would be hard to imagine a more difficult argument than that [the priest's] illicit sexual pursuits were somehow related to his duties as a priest or that they in any way furthered the interests of St. Rita's, his employer.  Instead, given [the priest's] vow of celibacy and the Catholic Church's unbending stand condemning [sexual] relations [outside of marriage], [the priest's] acts represent the paradigmatic pursuit of some purpose unrelated to his master's business."); *Olinger v. Corp. of the Pres. of the Church of Jesus Christ of Latter-Day Saints,* 521 F. Supp. 2d 577, 582 (E.D. Ky.2007) (granting judgment in favor of church for alleged sexual misconduct by missionary, determining "no reasonable jury could find that [missionary] was acting within the scope of his missionary work or that he was acting to advance any cause of the COP when he allegedly molested 'A'); *Doe v. Catholic Soc. Of Religious and Literary Educ.*, CA. No. H-09-1059, 2010 WL 345926 (S.D .Tex. Jan. 22, 2010) (outside scope of employment and did not further employer's interests); *Doe v. Capuchin Franciscan Friars*, 520 F. Supp. 2d 1124, 1131-32 (E.D. Mo. 2007) (holding a priest's alleged sexual abuse of a minor "clearly reflects 'purely private and personal

*Tell*, Amaral's repeated sexual abuse of plaintiff represents "the paradigmatic pursuit of some purpose unrelated to his master's business."[204]  Rather than being tangentially related to MHM's goals of providing mental health and substance abuse treatment,[205] Amaral's repeated misconduct was committed solely in furtherance of his own purposes.

*Doe* established the time and space parameters of an improper sexual act are not necessarily determinative of whether the conduct falls within the scope of employment.  In *Doe*, the sexual assault committed by the police officer occurred in his police car.[206]  Despite the location of the act, the court in *Doe* found the definitive factor to be that the act was so far outside the scope of the officer's employment that "it would be unreasonable as a matter of law for a jury to find [officer] acted in the scope of his employment."[207]  Like the conduct in *Doe*, "common sense dictates that sexually assaulting" an inmate is not incidental to providing treatment and counseling.[208] Therefore, the inappropriate actions as claimed by plaintiff are similarly outside the

---

desires and not Defendants' business or interests"); *Doe v. Liberatore*, 478 F. Supp. 2d 742, 758 (M.D. Pa.2007) ("[I]t is clear that [the priest's] sexual molestation of Plaintiff was not within the scope or nature of his employment as a priest.  Indeed, '[t]he activity of which [Plaintiff] now complains is wholly inconsistent with the role of one who is received into the Holy Orders as an ordained priest of the Roman Catholic Church.'"); *Graham v. McGrath*, 363 F. Supp. 2d 1030, 1034 (S.D. Ill.2005) ("Taking into consideration [the priest's] vow of celibacy and the Catholic Church's stance of condemning homosexual relations, [the priest's] actions represent the paradigmatic pursuit of some purpose unrelated to his master's business."); *Wilson v. Diocese of New York of Episcopal Church*, No. 96 Civ. 2400 JGK,1998 WL 82921, at *5 (S.D.N.Y. Feb. 26, 1998) ("[A]cts of sexual misconduct by priests such as those alleged here are outside the scope of the priests' employment and are clearly not in furtherance of either the Diocese's or the Trinity Defendants' business."); *Nutt v. Norwich Roman Catholic Diocese*, 921 F. Supp. 66, 70-71 (D. Conn.1995) ("[S]exual abuse . . . cannot be said to further the defendant's business and therefore is outside the scope of employment[.]")).

[204] *Tell*, 2010 WL 1691199, at *11.
[205] D.I. 1, Ex. B at ¶ 7.
[206] *Doe*, 2012 WL 1664234, at *1.
[207] *Id.* at *4.
[208] *Id.* at *3.

30

scope of Amaral's employment as a counselor, because they are directly counter to MHM's purpose of providing mental health care and treatment to inmates.

Unlike *Draper*, where the court found "a continuous course of action which commenced initially . . . with the carrying out by [employee] of the duties for which he had been hired,"[209] *Simms* concluded sexual abuse does not occur in the context of otherwise authorized acts of a residential counselor.[210]

Finally, plaintiff maintains whether an employee is acting within the scope of his employment is a question of fact for the jury.[211]  Although scope of employment may be a jury determination, as recognized in *Draper*, it is not where "the contrary is so clearly indicated by the facts that the court should decide it as a matter of law."[212]  Similarly, comment d to § 228 of the Restatement acknowledges the "question of whether or not the act done is so different from the act authorized that it is not within the scope of the employment is decided by the court if the answer is clearly indicated."  As previously addressed herein, the factual contentions demonstrate Amaral's inappropriate conduct was "in no way motivated at least in part by the desire to serve [MHM's] interests,"[213] and contrary to his role as a counselor.

Consequently, because establishing that Amaral acted within the scope of employment is a necessary element for a *respondeat superior* claim, under FED. R. CIV. P. 12(b)(6), Count VII of the amended complaint does not survive a motion to dismiss,[214]

---

[209] *Draper*, 54 Del. at 448.
[210] *Simms*, 2004 WL 344015, at *7.
[211] D.I. 11 at 12.
[212] *Draper*, 54 Del. at 442 (citing Restatement (Second) of Agency, § 228, comment d).
[213] *Id.* at 445.
[214] *Iqbal*, 556 U.S. at 678.

and MHM's motion to dismiss this count, inclusive of all claims against Amaral as imputed under *respondeat superior* is granted.

## V.    ORDER AND RECOMMENDED DISPOSITION

For the reasons contained herein, it is recommend that:

(1) MHM's motion to dismiss Count XIII of the amended complaint pursuant to FED. R. CIV. P. 12(b)(6) based on *respondeat superior* liability for civil rights violations committed by Johnson (D.I. 3) be granted.

(2) MHM's motion to dismiss Count VII of the amended complaint pursuant to FED. R. CIV. P. 12(b)(6) based on *respondeat superior* liability for civil rights violations committed by Amaral be granted.

(3) Plaintiff's request to amend his amended complaint to state a direct civil rights claim against MHM be granted.  Plaintiff shall file his amended complaint consistent with the findings herein and D. DEL. LR 15.1, on or before August 2, 2013.  Attached as an exhibit to the amended complaint shall be a marked up amended complaint indicating in what respect it differs from the pleading it amends consistent with LR 15.1(b).  Any response to the amended complaint shall occur within the time frame required under the Federal Rules of Civil Procedure and this court's local rules.

(4) MHM's motion to dismiss Count VII of the amended complaint pursuant to FED. R. CIV. P. 12(b)(6) based on *respondeat superior* liability for all other claims against Amaral be granted.

Pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. P. 72 (b)(1), and D. DEL. LR 72.1, any objections to the Report and Recommendation shall be filed within fourteen (14) days limited to ten (10) pages after being served with the same.  Any response

shall be limited to ten (10) pages.[215]

The parties are directed to the Court's Standing Order in Non-Pro Se Matters for Objections Filed under FED. R. CIV. P. 72 dated November 16, 2009, a copy of which is found on the Court's website (www.ded.uscourts.gov.)

Date: June 28, 2013                          /s/   Mary Pat Thynge
                                             UNITED STATES MAGISTRATE JUDGE

---

[215] FED. R. CIV. P. 72(b)(2).